N. ARI WEISBROT (NAW6029)
PHILLIPS NIZER LLP
Court Plaza North
25 Main Street, 6th Floor
Hackensack, New Jersey 07601
Attorneys for Plaintiffs
(201) 487-3700

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

HARVEY D. WOLINETZ, PARK
NATIONAL CAPITAL FUNDING, LLC,
PARK NATIONAL MORTGAGE
SERVICING, H.D.W. 2005, LLC, H&N
ASSOCIATES, ARETZ ASSOCIATES,
H.D.W. 2005 FOREST, LLC, H.D.W. 2005
NEW CASTLE, LLC,  and H.D.W. 2005
EDGEWATER, LLC

Plaintiffs,

v.

ELIYAHU WEINSTEIN, RIVKA BICHLER,
SIMCHA SHAIN, ELANA SHAIN,
MICHAEL GINDI, NEW CEDAR
HOLDINGS, LLC, OCEAN REALTY 101,
LLC, PINE PROJECTS, LLC, NH-K
MEMPHIS, LLC,

Defendants.

Civil Action No.:  2008-cv-5046-MLC-JJH

Hon. Mary L. Cooper, U.S.D.J.
Hon. Douglas E. Arpert, U.S.M.J.

## FIRST AMENDED COMPLAINT

Plaintiffs Harvey D. Wolinetz ("Mr. Wolinetz"), Park National Capital Funding LLC

("Park Funding"), Park National Mortgage Servicing ("Park Servicing"), H.D.W. 2005, LLC

("HDW 2005"), H&N Associates ("H&N"), Aretz Associates ("Aretz"), H.D.W. 2005 Forest,

LLC ("HDW 2005 Forest"), H.D.W. 2005 New Castle, LLC ("HDW 2005 New Castle"), and

H.D.W. 2005 Edgewater, LLC ("HDW 2005 Edgewater") (collectively "Plaintiffs"), by way of

complaint against Defendants Eliyahu Weinstein a/k/a Eli Weinstein ("Weinstein"), Rivka

Bichler, Simcha Shain ("Shain"), Elana Shain, Michael Gindi ("Gindi"), New Cedar Holdings, LLC ("New Cedar"), Ocean Realty 101, LLC ("Ocean Realty"), Pine Projects, LLC, and NH-K Memphis, LLC ("NH-K"), (collectively, "Defendants"), allege and say:

## STATEMENT OF THE CASE

1.    Plaintiffs bring this Complaint to recover damages incurred as a result of the Defendants' fraudulent scheme through which they, collectively, individually, jointly, and severally, conspired to defraud Mr. Wolinetz of at least $79 million by making false representations that Plaintiffs would be provided with an interest in at least 12 different properties located in New Jersey, Florida, New York, Tennessee, Georgia, and Pennsylvania. Instead, Plaintiffs' funds were improperly misappropriated, diverted, and converted for Defendants' own gain leaving Plaintiffs out more than $79 million without any meaningful interest in the properties.

2.    In short, Weinstein and his co-conspirators solicited tens of millions of dollars from Mr. Wolinetz (and entities in which Mr. Wolinetz maintains an ownership interest), for alleged investments in real estate and based upon fraudulently-documented promises and representations of substantial returns on the investments.  The scheme was well-conceived, extremely complex, and designed to lure Mr. Wolinetz - - a fellow member of the orthodox Jewish community in which both Weinstein and Mr. Wolinetz are active members, at a time that Mr. Wolinetz was mourning the well-publicized deaths of his wife, father, and mother. In a relatively short period, Weinstein and his co-conspirators presented Mr. Wolinetz with a series of attractive and fraudulently documented real estate transactions.  As set forth herein, after making the approximate $79 million investments, Mr. Wolinetz slowly began to discover the fraud. Specifically, Weinstein and his co-conspirators either (1) never invested in the proposed

2

1070284.1

properties; (2) never registered or acknowledged Mr. Wolinetz's investments or ownership interests; (3) unduly encumbered some of the real properties with undisclosed debt, mortgages, or even outright transfers, thereby rendering worthless Mr. Wolinetz's investments, and/or (4) used, diverted, or misappropriated Mr. Wolinetz's money for Weinstein's own nefarious purposes.  In some instances, upon information and belief, Weinstein used Mr. Wolinetz's funds to re-pay other victims of unrelated frauds, in a complicated pyramid scheme designed to conceal his frauds.

3.    The real properties at issue (the "Properties"), include:

a.   Approximately 6,275 acres of land in Volusia County, Florida ("Edgewater")

b.   A shopping plaza containing a dark lease Kroegers Supermarket located in Atlanta, Georgia ("Kroegers");

c.   2650 Ellwood City New Castle Road, Shanango Township, Lawrence County, Pennsylvania ("New Castle");

d.   Commercial property located at 2027 Flatbush Avenue, Brooklyn, New York ("Flatbush");

e.   The Seagull Shopping Center at 1328 River Avenue, Lakewood, New Jersey ("Seagull");

f.   Two vacant lots located at Cedarbridge and New Hampshire Avenues, Lakewood, New Jersey, ("New Cedar Plaza");

g.   Two adjacent residential lots at 555 Joe Parker Boulevard, Lakewood, New Jersey ("Parker Blvd");

h.   75 Prospect Avenue, East Orange, New Jersey ("Prospect Ave");

i.   9-23 Berkeley Terrace and 794 Grove Street, Irvington, New Jersey ("Berkeley Terrace");

j.   160-166 Ellis Avenue a/k/a 760-780 Springfield Avenue, Irvington, New Jersey ("Ellis Ave");

k.   Kimball Cabana Apartments located at 2856 Kimball Avenue, Memphis, Tennessee ("Kimball Cabana"); and

l.   New Horizon Apartments located at 3619 Kingsgate Drive, Memphis, Tennessee

3

("New Horizon").

m. A vacant lot of land located at 2505 Forest Avenue, Staten Island, New York (the "Staten Island Property");

4.     Plaintiffs now bring this action alleging fraud, RICO violations, breach of fiduciary duty, breach of contract, conversion, unjust enrichment, promissory estoppel, civil conspiracy, and seek, among other things, the recovery of actual, compensatory, consequential, punitive and treble damages, the imposition of a constructive trust on the assets converted by defendants, an accounting, and injunctive relief.

## THE PARTIES

5.     Plaintiff Mr. Wolinetz is a resident of the State of Florida.

6.     Plaintiff Park National is a New York limited liability company with its principal place of business in New York, which is owned and controlled by Mr. Wolinetz. Park National also conducts business under the name Park National Mortgage Servicing.

7.     Plaintiff H&N Associates is a sole-proprietorship with its principal place of business in New York, which is wholly owned and controlled by Mr. Wolinetz.

8.     Plaintiff Aretz Associates is a New York partnership with its principal place of business in New York, which is 20% owned by Mr. Wolinetz.

9.     Plaintiff HDW 2005 is a New York limited liability company with its principal place of business in New York, which is owned and controlled by Mr. Wolinetz.

10.     Plaintiff HDW 2005 Forest is a New York limited liability company with its principal place of business in New York, which is owned and controlled by Mr. Wolinetz.

4

11.     Plaintiff HDW 2005 Edgewater is a sole-proprietorship with its principal place of business in Florida, which is wholly owned and controlled by Mr. Wolinetz.

12.     Plaintiff H.D.W. 2005 New Castle is a sole-proprietorship with its principal place of business in New York, which is wholly owned and controlled by Mr. Wolinetz.

13.     Defendant Weinstein is, upon information and belief, a resident of the State of New Jersey.

14.     Defendant Rivka Bichler a/k/a Rivky Weinstein is, upon information and belief, a resident of the State of New Jersey.

15.     Defendant Shain a/k/a Sim and/or Simcha Shain is, upon information and belief, a resident of the State of New Jersey.

16.     Defendant Elana Shain is, upon information and belief, a resident of the State of New Jersey.

17.     Defendant Gindi is, upon information and belief, a resident of the State of New Jersey.

18.     Defendant New Cedar is, upon information and belief, a New Jersey limited liability company with its principal place of business in New Jersey, which is owned and controlled by Weinstein and Shain.

19.     Defendant Ocean Realty is, upon information and belief, a New Jersey limited liability company or corporation with its principal place of business in New Jersey, which is owned and controlled by Weinstein.

5

20.     Defendant Pine Projects is, upon information and belief, a New Jersey limited liability company with its principal place of business in New Jersey, which is owned and controlled by Weinstein and Shain.

21.     Defendant NH-K Memphis, LLC is, upon information and belief, a Delaware limited liability company with its principal place of business in New Jersey, which is owned and controlled by Weinstein, Gindi, and Shain.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1332(a) because all Plaintiffs and all Defendants are citizens of different states and the amount in controversy exceeds $75,000.00.

23.     The Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and, with respect to certain claims, 28 U.S.C. § 1367.

24.     This Court has personal jurisdiction over the Defendants insofar as they reside in and/or conduct business in this State and in this district, and several of the Properties are located in New Jersey.  Moreover, many of the transactions occurred in this district and the causes of action arose herein.

## FACTUAL BACKGROUND

25.     Weinstein and Mr. Wolinetz are both members of an Orthodox Jewish community in which it is customary for business to be transacted without any documentation or through simple letter agreements (and/or a handshake) prepared by the parties themselves.  Weinstein exploited this custom to procure Mr. Wolinetz's trust and to defraud Plaintiffs from early 2005 to date, keeping the fraud going with a series of deceptions, omissions, and affirmative misrepresentations.

6

26.     Specifically, Weinstein and his co-conspirators engaged in a criminal enterprise designed to steal substantial sums of money from Plaintiffs and numerous other victims by offering knowingly false representations - - supported by forged and false documents - - relating to the identity of the alleged investment properties, property values, ownership, debt, mortgage positions, and development status of property.  In many cases, Weinstein and his co-conspirators transferred the same property to multiple victims, diverted the substantial payments, and left the victims to litigate ownership. In other cases, Weinstein and his co-conspirators "transferred" property that they did not, in fact, own and in which he had no ownership interests.  In addition, Weinstein prepared multiple "ownership" documents identifying, alternatively, himself or Wolinetz as the 100% owner of particular property in order to convince Wolinetz that the property had been acquired with Wolinetz' funds and in Wolinetz's name.    Meanwhile, Weinstein used the alternative "ownership" documents to obtain mortgages or loans secured by the property.

27.     Based on their religious affiliations, and having just lost his wife and mother, and while caring for his 91-year old father, Mr. Wolinetz reposed confidence and trust in Weinstein to guide and inform him with respect to real estate projects and Weinstein accepted his trust. As a result, Defendant Weinstein and Plaintiff Mr. Wolinetz had an implied fiduciary relationship pursuant to which Weinstein owed Mr. Wolinetz a fiduciary duty.

## RICO CLAIMS

### Criminal Enterprise

28.     Weinstein led a continuing and discrete enterprise comprised of his associates, Gindi, Shain, and Bichler, and included his attorney, Benjamin Hager, ("Hager"), who were associated in fact and who engaged in, and whose activities did affect, interstate and foreign

7

commerce (the "Enterprise").

29.     The Enterprise was organized and its independent existence was designed for the purposes of investing in, managing, assigning, transferring, acquiring and/or selling real properties throughout the United States and utilized various corporate shells  - - including, primarily, Pine Projects, LLC, to achieve its objectives.

30.     The Enterprise was formed for the purposes of engaging in criminal and fraudulent activities designed to convert, misappropriate, and steal substantial sums of money from its many victims.     Likewise, all Defendants did conduct and/or participate, either directly or indirectly, in the conduct of the affairs of said RICO *Enterprise* through a *pattern of racketeering activity*, all in violation of 18 U.S.C. §§ 1961(4), (5), (9), and 1962(c).

31.     For a period commencing in or about 2005 through the present, the Enterprise engaged in, among other things, wire fraud, mail fraud, bank fraud, and mortgage fraud.

32.     During at least the ten (10) calendar years preceding March 1, 2009, all Defendants did cooperate jointly and severally in the commission of two (2) or more of the RICO predicate acts that are itemized in the RICO laws at 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C. 1962(c) (Prohibited activities).

33.     At all times material, the Enterprise organized, controlled, operated, participated in, and furthered the various corporations named herein in order to perpetrate an essentially identical scheme to defraud over and over again. The particular acts of mail and wire fraud causing injury to the individual victims are set forth herein.

34.     All victims, however, were subject to Defendants' general scheme to defraud that was repeated over and over again, regardless of Defendants' corporate shell or the false "business opportunity" being promoted by that shell. In general, Defendants perpetrated the

8

scheme against all of the Plaintiff victims named in this lawsuit.

**Pattern of Racketeering Activity**

35.    In addition, Defendants perpetrated virtually identical schemes against numerous other victims who have already brought lawsuits in other jurisdictions arising from Defendants' enterprise.

36.    Specifically, Rabbi Moshe Meisels has asserted claims in the Superior Court of New Jersey, Chancery Division, Ocean County, under Docket No.: C-14-09, alleging that, in 2006-2007, Weinstein and his co-conspirators stole substantial sums of money from Meisels and other victims by offering knowingly false representations - - supported by forged and false documents - - relating to the identity of various alleged investment properties, property values, ownership, debt, mortgage positions, and development status of property. In at least one case, it appears that Weinstein sold the very same property to Meisels, Wolinetz, and a third party.

37.    Another victim, 700 North Delaware LLC has asserted claims in the United States District Court for the Eastern District of Pennsylvania, under Civil Action No.: 07-cv-02252 alleging that, in or about 2007, Weinstein had solicited funds with the promise of the transfer of certain real property that Weinstein never transferred.   The Complaint alleges that Weinstein misappropriated the funds but never transferred the property.

38.    Another victim,   Yehoshua Birnhack,   has asserted claims in the United States District Court for the Eastern District of Pennsylvania, under Civil Action No.: 08-cv-02870, alleging that, in or about 2007 – 2008, Weinstein and his co-conspirators stole substantial sums of money from Birnhack and other victims by offering knowingly false representations - - supported by forged and false documents - - relating to the identity of various alleged investment properties, property values, ownership, debt, mortgage positions, and development status of

9

property.

39.      Another victim,  Morris Freund,  has asserted claims in the United States District Court for the Eastern District of New York, under Civil Action No.: 08-cv-1469, alleging that, in or about 2006-2007, Weinstein and his co-conspirators stole substantial sums of money from Freund and other victims by offering knowingly false representations - - supported by forged and false documents - - relating to the identity of various alleged investment properties, property values, ownership, debt, mortgage positions, and development status of property.

40.      Another victim,  Aron Abecassis,  has asserted claims in the United States District Court for the District of Delaware, alleging that, in or about 2007, Weinstein and his co-conspirators stole substantial sums of money from Abecassis and other victims by offering knowingly false representations - - supported by forged and false documents - - relating to the identity of various alleged investment properties, property values, ownership, debt, mortgage positions, and development status of property.

41.      Another victim,  Berish Berger,  has asserted claims in the United States District Court for the Eastern District of Pennsylvania, under Civil Action No.: 07-cv-0994, Weinstein and his co-conspirators stole substantial sums of money from Berger and other victims by offering knowingly false representations - - supported by forged and false documents - - relating to the identity of various alleged investment properties, property values, ownership, debt, mortgage positions, and development status of property.

42.      As set forth with more specificity below, the Defendants committed, among other things, Mail Fraud, in violation of 18 U.S.C. 1343 and Wire Fraud, in violation of U.S.C. § 1344, in connection with the following transactions.

10

**Predicate Acts**

FLORIDA

43.      From September 9, 2005, through February 6, 2006, Weinstein and the Enterprise

engaged a scheme, through Pine Projects, to obtain $37.5 million from Plaintiffs Park National,

H&N Associates, Aretz Associates, and Park National Mortgage Servicing.

44.      Specifically, Weinstein requested a loan from the above Plaintiffs at 15% interest

allegedly for the purpose of purchasing the Edgewater property.  Weinstein represented in

several telephone conversations that the investment would yield rental income from the orange

groves located at the property.  Weinstein presented Plaintiffs with two "rent" checks as an

inducement to make the investment. The first check cleared but, later, after Plaintiffs made the

investment, the second check was returned for insufficient funds, in violation of 18 U.S.C. 1344.

In addition, Weinstein made numerous representations that, because of valuable "mineral rights,"

he had already secured offers to purchase the property. These representations were false.

45.      Weinstein stated that Plaintiffs would be repaid upon resale or disposition of the

property as well as receive 50% of any profits on the sale. Plaintiffs invested the $37.5 million

with Defendants at various intervals but never received verification that any property was

actually purchased.  Weinstein has since told Mr. Wolinetz that he purchased the Edgewater

property, using his own entity, Edgewater 55, LLC, and then resold the property to a third party

without Plaintiffs' knowledge or consent and without distribution of principal or profits to

Plaintiffs.

46.      Weinstein advised in a telephone conversation with Plaintiffs, in or about late

2005, that Plaintiffs' principal was reinvested in the purchase of other properties owned by Adar

Developers LLP and located in Baker County, Florida.  Despite repeated requests to Weinstein,

1070284.1

Plaintiffs have not received any records of these properties' location, purchase price, financing, etc., and Weinstein has refused to turn over any information or the funds.

47.     Amram Adar, CEO of Adar Developers, has represented to Mr. Wolinetz and his accountant that Weinstein did in fact invest funds with his company to purchase land in Baker County, Florida.   While Plaintiffs do not know the location of these parcels, they have determined from information on Adar Developers' website that the developer owns at least 3 parcels of land in Baker County, Florida.

48.     In furtherance of his criminal enterprise, on January 21, 2006, Weinstein amended the Operating Agreement for Edgewater 55, LLC to transfer all of his interests in that company to HDW 2005 Edgewater.   At the time of the transfer, however, the membership interest was worthless because Weinstein had either never held property in that entity or had already sold the company's only asset -- the Edgewater property -- and invested the proceeds into property owned by Adar Developers LLP.   Weinstein sent the fraudulent operating agreement through U.S. Mail, in violation of 18 U.S.C. 1343.

49.     In sum, Plaintiffs' funds were diverted without authorization to various other properties owned by Defendants or used by Weinstein for personal purposes.   Upon information and belief, at the time of the payment of funds by Plaintiffs to Weinstein, Weinstein had no intention of repaying the funds.

50.     To keep his scheme going, in light of Mr. Wolinetz's demand for records and payment of the $37.5 million loan, Weinstein advised Mr. Wolinetz in a telephone conversation that he would transfer $14,436,227 of equity from the Edgewater land deal to the One Flagler office building in downtown Miami. As additional consideration for the transfer, Mr. Wolinetz invested an additional $1.5 million into the project. Upon information and belief, Weinstein's

12

1070284.1

equity interest could be, at best, valued at $6.5 million. Weinstein also assigned his interests in a property located at 230 S.W. 3rd Street, Miami, Florida as additional collateral for the $37.5 million loan. However, such interest is, upon information and belief, worthless. Weinstein sent the fraudulent assignment agreement through U.S. Mail, in violation of 18 U.S.C. 1343.

51.    Despite the transfer of equity and the disposition of the membership interest for One Flagler Holdings LLC, Plaintiffs are still owed, at least, $31.5 million plus interest on the $37.5 million loan.

ATLANTA, GEORGIA

52.    On September 1, 2005, Plaintiff Park National Mortgage Servicing, through its related entities, H & N Associates and Aretz Associates, lent Defendant Pine Projects $5.4 million based on Weinstein's representation that he would use the funds to finance the purchase of a dark lease[1] Kroegers shopping center. At the time he requested the loan, Weinstein had no intention of repaying it.

53.    Weinstein advised Plaintiffs in several telephone conversations that the address for the Kroegers property was 5230 Salem Avenue in Trotwood, Georgia. Plaintiffs later discovered that no such address exists. In addition, Weinstein claimed to be receiving approximately $138,000 in monthly funds from Kroegers and showed the "cash receipts" to Plaintiffs' accountant on his computer screen. Subsequently, after making the investment, Plaintiffs discovered that no such rent could be documented by Kroegers as having been paid and that the "records" had been fraudulent.

54.    Mr. Wolinetz does not know whether the Kroegers shopping center was ever purchased or whether Weinstein diverted the funds to other projects. Mr. Wolinetz has

---

[1] The term "dark lease" refers to a property which was leased to a business which ceased doing business (i.e., went dark).

13

repeatedly asked for documentation regarding the purchase of the Kroegers shopping center, but Weinstein has refused to provide any information and has made such excuses that the papers were locked in his car.

55.    To date, despite repeated demands from Mr. Wolinetz, Weinstein has refused to account for the loan. Although some payments were made, Weinstein refused to explain whether the payments were the promised interest or a return of capital.   Furthermore, in multiple telephone calls and electronic mail to Plaintiffs, on or about October and November 2005, Weinstein twice claimed that the property was or would be refinanced and that never happened. In fact Park National is in possession of a copy of an undeposited check for $5,400,000 which Weinstein sent by U.S. Mail, in violation of 18 U.S.C. 1343, to fraudulently make it appear that he was indeed refinancing but the refinance never happened.

56.    There remains an outstanding principal balance on the loan in the current amount of $5.4 million, exclusive of interest and late fees.

LAWRENCE COUNTY, PENNSYLVANIA

57.    In the weeks preceding March 21, 2005, Weinstein approached Mr. Wolinetz seeking a loan of $1.4 million for the purchase of a shopping center in New Castle, Pennsylvania.   Weinstein falsely represented to Wolinetz that the funds would be used to purchase the New Castle property. AM OBR LP, an entity purportedly owned by Weinstein, and HDW 2005 New Castle entered into an agreement, dated March 7, 2005, for repayment of the $1.4 million loan at a 15% interest rate.

58.    Weinstein further misrepresented that he was purchasing the New Castle property through AM OBR LP. AM OBR LP, however, was to convey all of its membership interest to HDW 2005 New Castle in exchange for the $1.4 million loan which interest would be returned

14

upon repayment of the debt. In addition, HDW 2005 New Castle was to receive a 5% interest in the profits earned on the property after all mortgage, taxes and expenses had been paid in full.

59.     In reliance on all of Weinstein's misrepresentations, on March 21, 2005, Plaintiff Park National provided the $1.4 million to Defendant Pine Projects. Weinstein, upon information and belief, had no intention of complying with any of the terms and conditions of the deal, and in fact, he did not even plan to purchase the New Castle property.

60.     New Castle was never purchased - - a fact which Weinstein later admitted but later claimed that the $1,400,000 was now a personal debt owed by Weinstein to Mr. Wolinetz. Upon information and belief, Weinstein kept the money and converted it for his own use.

61.     Upon information and belief, Weinstein and Shain wired the funds to finance other real estate projects and to purchase other properties owned by Defendants without Plaintiffs' knowledge or consent. This illegal transfer of funds constitutes wire fraud, in violation of 18 U.S.C. 1343.

62.     To date, despite repeated demands from Mr. Wolinetz, Weinstein has not fully re-paid the loan and has not offered any return on the investment. There remains an outstanding principal balance on the loan in the current amount of $1.2 million, exclusive of interest and late fees.

OCEAN COUNTY, NEW JERSEY

63.     From May through August 2005, Weinstein approached Mr. Wolinetz on several occasions seeking financing for the purchase of certain properties located in Ocean County, New Jersey.

###     A.     SEAGULL SHOPPING CENTER

64.     On or around May 2005, Weinstein approached Mr. Wolinetz and requested that

15

he finance Defendant Ocean Realty's purchase of the Seagull Shopping Center for $10.7 million. Between May 11, 2005 and May 20, 2005, Plaintiffs Mr. Wolinetz, Park National, and H&N Associates loaned $6,050,000, at a yearly interest rate of 15%, to Pine Projects for the benefit of Ocean Realty. Prior to making the loan, Weinstein represented to Wolinetz and his employees, in electronic mail and by telephone, that Mr. Wolinetz would have a mortgage on Seagull and the loan would be fully repaid by May 10, 2006. In accordance with Weinstein's representations, Ocean Realty executed a mortgage and a note in favor of Park National. Weinstein, upon information and belief, had no intention of performing or repaying Plaintiffs. This mortgage and note were fraudulent, in violation of 18 U.S.C. 1344.

65.    By letter dated June 29, 2005, Hager "confirmed" to Plaintiffs that Hager was holding $9 million in escrow to be used to pay off an existing mortgage on the Seagull property. Hager later denied having any funds in escrow and admitted that, at the time he sent the letter, he knew that he did not have any of the funds in escrow. Upon information and belief, the funds were either never held in escrow or they were diverted and misappropriated by Weinstein and/or Hager. The letter was sent through U.S. Mail, in violation of 18 U.S.C. 1341.

66.    On July 28, 2006, Ocean Realty obtained a first mortgage from Independence Community Bank for $9,280,000 secured by a mortgage on Seagull and an assignment of leases and rents (the "Independence Mortgage"). The proceeds of that loan were not used to pay off Plaintiffs' loan and the loan remains unpaid. On information and belief, Weinstein did not disclose to the bank the fact that Park National had an ownership interest in the property, in violation of 18 U.S.C. 1344.

67.    In fact, Defendants have borrowed $15,330,000 against Seagull which was purchased for $10.7 million. This excessive borrowing has eliminated Plaintiffs' ability to

16

recover their loan through liquidation of the property. Moreover, Defendants' misconduct has defrauded the Bank and rendered its mortgage meaningless, in violation of 18 U.S.C. 1344.

68.    In or about September 2007, Defendants ceased making interest payments of the loan. The amount outstanding on this loan is $6,050,000.

### B.    NEW CEDAR PLAZA

69.    In the weeks proceeding June 1, 2005, Weinstein approached Mr. Wolinetz and represented that Weinstein had accepted an offer from Lakewood Township to exchange certain unimproved real property adjacent to Seagull - - previously acquired by Ocean Realty and/or Weinstein at the time he acquired Seagull - - for lots 1.02 and 2.02 of the New Cedar Plaza ("New Cedar"). Weinstein further represented that, in connection with the "exchange" of the two properties, the Independence Mortgage security was also "transferred" from Seagull to New Cedar.

70.    On June 1, 2005, Plaintiff Park National loaned Weinstein $9 million at an interest rate of 13% set to mature on June 27, 2007. The loan was originally intended to refinance Seagull but, with the alleged "exchange" of the New Cedar property for the vacant land adjacent to Seagull, the parties agreed that the $9 million from Mr. Wolinetz would also be transferred to New Cedar. Again, Weinstein never intended to perform and used only a portion of the $9 million to purchase the New Cedar Plaza and converted the remainder for his own use.

71.    Specifically, contrary to Weinstein's representations, the New Cedar Plaza, comprised of the two lots, was purchased by New Cedar, a company owned by Defendants Weinstein, Shain, and Yisroel M. Pollak, in two transactions from two different sellers.

72.    Pursuant to the terms of parties' agreement, a 1/2% extension fee of $45,000 was to be paid in the event Weinstein was more than six (6) months late on a payment. On July 17th

17

2006, Weinstein furnished to Park National Capital Funding a check for $45,000.00 but the check was never presented because Weinstein's bookkeeper, Sandie Brown, advised that there were insufficient funds. Weinstein frequently provided Wolinetz with checks that were returned for insufficient funds, in order to avoid deadlines, penalties, or other ramifications, in violation of 18 U.S.C. 1344

73.    Upon information and belief, New Cedar purchased lot 1.02 for $6.5 million. It paid $1.5 million in cash and used seller-financing for the rest. As a result, New Cedar provided a first mortgage to the sellers Stamos & Sommers LLC, dated September 28, 2005, for $5 million.

74.    Thereafter, on January 26, 2006, New Cedar purchased lot 2.02 for $3,149,899.47. New Cedar then obtained new loans and provided mortgages, secured by both lots 1.02 and 2.02, from Manchester Capital, LLC ("Manchester") on February 3, 2006, for $2,355,000, from Christian C. Romandetti on June 30, 2006, for $3 million, and from Moshe Freund on April 30, 2007, for $4,640,000.

75.    As a result, Defendants obtained $14,995,000 in financing (including the $9 million from Mr. Wolinetz) on property purchased for $9,649,899.47.

76.    In June 2007, Mr. Wolinetz's $9 million loan matured and Defendants failed to repay it. In addition, the Defendants defaulted upon Manchester's secured interest and, as a result, the property is currently the subject of a foreclosure action instituted by Manchester against the Defendants and Mr. Wolinetz. By failing to disclose Plaintiffs' interests in the property, and by over-financing the property, Defendants engaged in bank fraud, in violation of 18 U.S.C. 1344.

## C.   PARKER BLVD

77.    On July 27, 2005, Weinstein, as an individual, purchased Parker Blvd, comprised of a single-family dwelling, for $770,000.  Weinstein falsely represented to Plaintiff H&N Associates that the purchase price would be $3,550,000, that he needed a loan and that such funds would be used to finance the purchase and development of Parker Blvd along with adjacent farm land he would purchase. Weinstein also stated in numerous telephone conversations with Wolinetz and his employees during the summer of 2005, that the loan would be secured by Parker Blvd and the improvements thereon.  Thereafter, Weinstein obtained a loan from Plaintiff H&N Associates for $3,550,000 at a 12% interest rate payable monthly. It was agreed that Weinstein would make the payments  immediately upon the re-sale of the property - - which Weinstein later claimed fell through. Weinstein's fraudulent representations were made, in part, over the telephone, in violation of 18 U.S.C. 1343.

78.    At the time of requesting the loan from Plaintiff H&N Associates, Weinstein had no intention to purchase or develop Parker Blvd with the borrowed funds.  Instead, he kept Plaintiff H&N Associates' funds and converted them for his own use.

79.    Subsequently, without Plaintiffs knowledge or consent, on August 18, 2005, Weinstein obtained a loan from First Financial Equities, Inc. for $423,000 and secured it with a first mortgage on Parker Blvd. Again, on August 29, 2005, Weinstein, Rivka Bichler (his wife), Benjamin Gelbhauer, Simcha Shain, and Elana Shain obtained a second mortgage from Scott Siegelman for $462,843.69 secured by Parker Blvd.  In obtaining these mortgages without disclosing to the lenders Plaintiffs' interests in the property and without disclosing the alleged agreement with Plaintiffs, Defendants committed bank fraud, in violation of 18 U.S.C. 1344.

80.    In sum, Parker Blvd was not improved and has a debt obligation of

$4,435,843.69, and in which, at this time, the lender has commenced foreclosure proceedings.

BERKELEY TOWNSHIP, NEW JERSEY

81.     Prior to November 21, 2005, Weinstein approached Mr. Wolinetz and solicited a loan for $8 million at an interest rate of prime plus 7.5% payable monthly for the purchase of a building located in Berkeley Township, New Jersey.  Weinstein falsely represented that he had obtained financing from Lehman Brothers and CU Business Capital LLC that would pay off the requested $8 million loan by January 4, 2006.  Weinstein falsely represented that he would also make a loan for $4.5 million in order to acquire and/or develop the properties.  In addition, Weinstein promised Plaintiffs a 40% equitable ownership in the building with Weinstein owning the remaining 60%.  In the event the loan was not repaid by the due date, the $8 million would earn interest at a rate of prime plus one percent payable monthly and the equitable ownership structure would change to 66.6% for Plaintiffs and 33.3% for Weinstein.

82.     In reliance on such representations, on or around November 21, 2005, Mr. Wolinetz loaned and/or guaranteed $8 million to finance the purchase of the building.

83.     Weinstein and Mr. Wolinetz entered into a letter agreement dated November 21, 2005, reflecting the terms of the foregoing loan.  Weinstein, however, never had any intention of using the $8 million loan in the purchase of a building.  The letter agreement was returned to Wolinetz through the U.S. mail, in violation of 18 U.S.C. 1341.

84.     In early June 2006, Weinstein disclosed that Mr. Wolinetz's $8 million loan had actually been diverted to other properties known as Prospect Ave, Berkeley Terrace, and Ellis Ave rather than the agreed upon building or otherwise performing the obligations under the agreement.

85.     Weinstein represented that Prospect Ave was purchased for $5,150,000 on

20

1070284.1

February 16, 2005, by Prospect Realty, which, according to Weinstein's assurances, was solely-owned by Weinstein, and financed with a mortgage from Washington Mutual for $4 million. In fact, Mr. Wolinetz later discovered that Weinstein did not own any interest in Prospect Realty, which was owned by other individuals and/or entities and, therefore, Weinstein did not maintain an ownership interest in Prospect Ave. Prospect Ave was then allegedly additionally funded using $3 million of the $8 million loan. This property was financed for $1,850,000 more than its purchase price.

86.   Moreover, Berkeley Terrace was purchased for $7.6 million on October 28, 2005, by Berkeley Acquisitions. That property was allegedly later additionally funded using $3 million of the Plaintiffs $8 million loan. This property was financed for $1,447,566 more than its purchase price.

87.   Finally, Ellis Ave was purchased for $1,740,000 on April 27, 2004, by Ellis Equities, which was solely-owned by Weinstein, and financed with a mortgage from Citibank F.S.B. for $1.4 million. It was allegedly later additionally funded using $2 million of the $8 million loan. This property was, therefore, financed for $1,660,000 more than its purchase price. Actual closing documents indicate that Weinstein sold the property to a third unrelated party.

88.   At a June 6, 2006 meeting, Mr. Wolinetz demanded repayment of his loan. Weinstein did not provide payment. Instead he promised that he could turn the Prospect Ave property into a Co-Op creating a high return for all investors. No such action was ever intended or performed. Weinstein further represented in multiple telephone conversations with Wolinetz and his employees, during June and July 2006, that he was attempting to obtain independent financing on all three properties from Washington Mutual in the amount of $17,500,000 for all three properties, cross-collateralized.

21

89.     In an effort to stall Mr. Wolinetz from exercising his legal rights, Weinstein also falsely stated that he would use his equity in other projects or personal funds to pay the shortfall between the mortgage proceeds and Plaintiffs loan.  No such payments have been made.  Thus, $7.4 million plus interest is still outstanding on the $8 million loan, with interest owed from October 1, 2007.

90.     Under pressure to offer some compensation for breach of the letter agreement, Weinstein provided Mr. Wolinetz with an amendment to the operating agreement for Prospect Realty in which he assigned all of his shares in Prospect Realty and Ellis Equities to HDW 2005 declaring that Weinstein had no rights or shares to those companies leaving HDW 2005 as the sole member of both companies. Similarly, on that same date, Defendant Gindi assigned all of his shares in Berkeley Acquisitions to HDW 2005.   Weinstein mails the purported amendments to Wolinetz, in violation of 18 U.S.C. 1341.

91.     In November of 2007, Mr. Wolinetz updated the corporate filings for Prospect Realty, Ellis Equities, and Berkeley Acquisitions to reflect the transfer of 100% of their interests to HDW 2005.  Mr. Wolinetz further secured his interest in the Prospect Ave, Ellis Ave, and Berkley Terrace properties by transferring their titles to HDW 2005.

92.     Before transferring 100% of the ownership interest in Prospect Ave to HDW 2005, Weinstein fraudulently sold an "interest" in Prospect Ave to two separate purchasers in two unrecorded sales and collected the proceeds.  He then fraudulently sold an "ownership interest" in Ellis Ave for $1,810,000 and kept the net proceeds.  Both sales occurred without Mr. Wolinetz's knowledge or consent and without any distribution to Plaintiffs.  Prospect Ave, Ellis Ave, and Berkley Terrace are highly leveraged and their ownership has been challenged by other Weinstein "investors."   Wolinetz later discovered that Weinstein never had the right to "sell" or

"transfer" Ellis Ave or Prospect Ave and received demands from other individuals who established that they were the rightful owners of those properties. Wolinetz was forced to return those properties to their rightful owners.

93.    In sum, Plaintiffs are owed a total of $7.4 million plus interest on the $8 million loan.

BROOKLYN, NEW YORK

94.    Prior to July 11, 2005, Weinstein approached Mr. Wolinetz and requested a loan in the amount of $3,960,000 for the purchase of the Flatbush property, which was formerly a car dealership. On or around July 11, 2005, Weinstein received a loan from Mr. Wolinetz in the amount of $3,960,000 at an interest rate of 15% purportedly for the purpose of purchasing the Flatbush property. The deed shows that the purchase price was $3,400,000, leaving $560,000 unaccounted for. On information and belief, such additional funds were improperly converted to Weinstein for his own purposes. Weinstein subsequently paid down $2,485,000 of the loan but the principal balance of $1,475,000 remains outstanding and that loan is in default. In addition, Weinstein granted Heshy Stern a $2.5 million first mortgage on the property.

95.    In addition, it appears that Weinstein "double deeded" the Flatbush property to multiple buyers, while misappropriating the proceeds. Hager represented Weinstein in the Flatbush transaction.

96.    In sum, Mr. Wolinetz has suffered damages in the amount of the $1,475,000 loan plus interest due.

MEMPHIS, TENNESSEE

97.    On or around October 2005, Weinstein approached Mr. Wolinetz seeking financing for the purchase of the Kimball Cabana and New Horizon apartment complexes in

Memphis, Tennessee. Weinstein represented that HDW 2005 Forest would receive interest at a rate of prime plus 7¼% and a 50% equity ownership in the project secured by a pledge agreement, dated November 1, 2005, pursuant to which Weinstein, as managing member, pledged all of his interest in Kimball Cabana and New Horizon to HDW 2005 Forest as collateral.

98.    Mr. Wolinetz was lured into investing in these Memphis properties by Weinstein's assurances that he would quickly "flip" the apartment complexes to a purchaser named Joseph Hecht, with whom he already had a sale contract and from whom he had an escrowed deposit of $5.5 million held by Hager, Weinstein's attorney in New York. Hager confirmed in writing sent by electronic mail that he was holding this deposit and that $2,750,000 would be released to the sellers in a week and the remainder in two to three weeks. Weinstein and Hager purposefully omitted the fact that the sale was contingent on the buyer obtaining 90-95% financing on the appraised value. When these conditions were not met, the full deposit was returned to Mr. Hecht and the property was not sold. Mr. Wolinetz was not informed of the contingency, the returned deposit, or the failed sale to Mr. Hecht for several months during which he persistently questioned Weinstein regarding the status of the sale.

99.    Based upon Weinstein's and Hager's representations and promises, Wolinetz obtained funds from his brother-in-law, in the amount of $11,220,000, and invested the money with Defendants. That money was given by Wolinetz's brother-in-law on Wolinetz's behalf, and Wolinetz guaranteed repayment to his brother in law.

100.    At the time of making false representations to Mr. Wolinetz to induce Plaintiffs to lend $11,220,000, upon information and belief, Weinstein had no intention of performing his obligations.

24

101.    In March 2006, in an effort to prevent Mr. Wolinetz from foreclosing on the LLC membership interest, Weinstein lied to Mr. Wolinetz again and stated in a telephone conversation (in violation of 18 U.S.C. 1341) that in two weeks Mr. Hecht would have a bank commitment that would pay Mr. Wolinetz completely. Weinstein further promised that if the bank commitment only provided 85% financing, the investors would take commercial paper for the other 5% in order to complete the sale.

102.    At a meeting between Mr. Wolinetz and Weinstein on June 6, 2006, the properties still had not sold and Mr. Wolinetz demanded repayment of the loan. Weinstein agreed to Mr. Wolinetz's demand and promised that if the loan was not paid off by June 30, 2006, the equity ownership in the deal would change to: Weinstein 33 1/3%, Mr. Wolinetz 66 2/3% and, in the meantime, the $11,220,000 million loan would continue to collect monthly interest at 15.25%.

103.    Pursuant to amendments to the operating agreements for Kimball Cabana and New Horizon executed in October 2006 and sent to Wolinetz via U.S. Mail, in violation of 18 U.S.C. 1341, the property ownership was structured as follows: New Horizon and Kimball Cabana (equally-owned by Weinstein, Shain and Gindi) each owned its respective apartment complex; the three members of New Horizon and Kimball Cabana all contributed 100% of their interests in the companies to NH-K so that Weinstein, Shain and Gindi each owned 33 1/3% of NH-K.

104.    On November 30, 2006, New Horizon purchased the New Horizon apartments for $34,560,000 with a mortgage from First Financial Equities Commercial LLC for $30.5 million. On the same date, Kimball Cabana purchased the Kimball Cabana apartments for $8,640,000 with a mortgage from First Financial Equities Commercial LLC for $5,650,000. The Seller is still owed $5.6 million and is suing Weinstein, New Horizon and Kimball Cabana for recovery

of the outstanding portion of the purchase price plus interest.

105.   Despite Weinstein's many promises, the properties have not been re-sold.   The apartment complexes are currently in receivership and are being horribly mismanaged, with an occupancy rate of approximately 40%.   They must be at 80% occupancy to break even after making mortgage payments and covering operating expenses.   Interest payments have not been made since October 2007.   Thus, the loans are in default with an outstanding amount of $11,220,000 plus interest due.   The bank has foreclosed upon New Horizon causing Plaintiffs substantial losses.

STATEN ISLAND

106.   On or around March 2005, Wolinetz was approached by Weinstein for an investment of $5 million to purchase vacant land located at 2505 Forest Avenue Staten Island, New York ("Forest Ave").   According to Weinstein, Wolinetz and his investors, acting through a Wolinetz entity (HDW 2005 Forest, LLC) was to purchase the premises for $5 million and own it outright.   For his part, Weinstein promised that a lease would be signed at closing with FAM Gindi, Inc., a New York corporation allegedly owned by Gindi, thereby guaranteeing income while the property was developed and sold.   Wolinetz was told that Gindi would lease the Premises and construct one or more structures for retail or office use.   On sale, Wolinetz would then be obligated to equally split any profits on the land with Weinstein.

107.   Based on Weinstein's false promises and misrepresentations, from March 28, 2005 through April 1, 2005, Wolinetz through various entities, paid $5 million to Weinstein and Pine Projects, for the purchase of Forest Ave.   Weinstein directed Hager to prepare organizational documents for HDW 2005 Forest, and Weinstein and Hager mailed such documents to Wolinetz reflecting Wolinetz's 100% membership interest in HDW.   Unbeknownst

to Plaintiffs, Weinstein and Hager prepared identical organizational documents reflecting Weinstein as the 100% member of HDW. Weinstein and Hager later used the phony organizational documents to obtain $4 million in loans secured by Forest Ave. The lenders are now seeking to foreclose on the property and have brought suit against HDW to recover the amount of the loans - - which were diverted by Weinstein and the Defendants for their own purposes, in violation of 18 U.S.C. 1343 and 1344.

108.    Weinstein misrepresented to Wolinetz that Forest Ave would be purchased using that $5 million payment plus a $407,597.44 contribution from Weinstein. In actuality, the deed shows that the property was purchased for a total price of $3,550,000.00 all of which came from Wolinetz's funds and the Defendants converted the remaining $1,450,000.00 for their own purposes without disclosing the price difference, in violation of 18 U.S.C. 1343.

109.    While certain lease payments were made by or on behalf of the Defendants, none of the purchase price was returned to Wolinetz or his investors.

MONTAUK BANK

110.    In March 2006, after a series of stock transactions from which Weinstein purchased and sold shares in various IPO's funded by Wolinetz, Weinstein thru his partner Meir Taouzer, acquired the entire sales proceeds of the sale of Montauk Bank (symbol: MCHX) in the amount of $6,600,000.00. Taouzer represented that he needed the proceeds to pay the taxes on previous profits when, in reality Taouzer was not involved with or a party to the transactions. After Wolinetz protested, Weinstein gave Wolinetz several signed checks drawn on the account of M.T. Motors (a Houston bank account) and told them to write the amount owed to Wolinetz. Wolinetz had the check made payable to Park National Mortgage Servicing for $3,476,000.00, the agreed upon amount. Upon deposit by Wolinetz, the check was returned stamped "Stopped

27

Payment."   Weinstein's conduct violated 18 U.S.C. 1344.

BAD CHECKS – VIOLATION OF 18 U.S.C. 1344

111.   Weinstein sent Wolinetz, through the U.S. Mail, in violation of 18 U.S.C. 1341, nine (9) checks made payable to Park National Mortgage Servicing for $100,000.00 for interest due Park National. The checks are drawn on the account of Pine Projects LLC or Pine Projects Management LLC.  Plaintiffs have been advised by the issuing banks not to deposit the checks because there are insufficient funds available.

112.   Weinstein sent Wolinetz, through the U.S. Mail, in violation of 18 U.S.C. 1341, a check payable to Park National Mortgage Servicing for $68,000.00 drawn on the account of Pine Projects LLC as a payment towards the interest owed on the Memphis property. The check was returned for insufficient funds.

113.   Weinstein sent Wolinetz, through the U.S. Mail, in violation of 18 U.S.C. 1341, a check for $30,000.00 payable to Park National Capital Funding that is stamped by the bank as "Unpaid, Do Not Redeposit," signed by Weinstein.

114.   Weinstein sent Wolinetz, through the U.S. Mail, in violation of 18 U.S.C. 1341, a check for $3,300,000.00 payable to Park National Capital Funding signed by Weinstein that was never available to deposit because of insufficient funds.

PROMISSORY NOTES

115.   Mr. Wolinetz and/or Park National lent money to Weinstein on various occasions for purposes other than funding property purchases or development.   These loans were memorialized in various promissory notes.

116.   On July 12, 2006. Weinstein executed a promissory note in favor of Park National promising repayment of $2.5 million loan at an interest rate of 12%.  The outstanding amount of

28

this loan is $1,450,000 plus accrued interest.

117.   On June 18, 2007, Weinstein executed a promissory note in favor of Park National promising repayment for a loan for $1.5 million at an interest rate of 15%. These funds had previously been lent by Plaintiff H&N Associates to Center 86, LLC, for Gindi's benefit. Defendant Gindi then transferred the $1.5 million to Weinstein. Neither Defendant has made any principal payments on that loan. Therefore, the current balance on that loan is $1.5 million.

118.   There have been and are presently numerous lawsuits filed in various jurisdictions involving related parties and relating to similar claims and transactions that are the subject of this complaint all arising out of Defendants' fraudulent scheme.

119.   In or about January 2008, Plaintiffs filed a universal and broad lawsuit in the United States District Court for the Southern District of Florida (the "Florida Lawsuit") and, almost immediately, Weinstein began to make promises - - supported by various confessions of judgment, written representations, and a draft settlement proposal - - each designed to convince Wolinetz to withdraw or forebear on the Florida Lawsuit and other collection actions.   Hager prepared the confessions of judgment on Weinstein's behalf, but many of the confessions were prepared in a manner that were deliberately unenforceable or were otherwise misleading and, therefore, were designed to fraudulent induce Plaintiffs into withdrawing their claims.

120.   Mr. Wolinetz and Weinstein subsequently met on a number of occasions to discuss and to attempt to settle all disputes between them relating to the real estate transactions that are the subject of this complaint.  At these meetings, Weinstein agreed to repay Wolinetz for some, but not all of his indebtedness to Mr. Wolinetz, and even provided Mr. Wolinetz with additional confessions of judgment in some, but not all, of the related lawsuits.

121.   Weinstein, therefore, remains indebted to Mr. Wolinetz for more than $79

million.

122.    All conditions precedent for bringing this action have been met, performed or waived.

## FIRST COUNT

### (Civil RICO – 18 U.S.C. 1962 (c))

123.    Plaintiffs repeat and re-allege the foregoing allegations as if more fully set forth at length herein.

124.    Defendants violated 18 U.S.C. §§ 1962(a) and 1962(d) by (i) receiving income from a pattern of racketeering, (ii) using such income to acquire and/or operate an interest in an enterprise, (iii) where such enterprise affects interstate and foreign commerce.

125.    As described above, numerous Defendants engaged in two or more predicate acts within ten years which constitute the Defendants' pattern of racketeering activity in violation of 18 U.S.C. §§ 1962(a) and 1962(d).  The scheme to fraudulently obtain and convert funds from Plaintiffs was perpetrated through wire fraud violations under 18 U.S.C. § 1343, mail fraud violations under 18 U.S.C. § 1341, and bank fraud violations under 18 U.S.C. 1344.  In addition, the Defendants also violated the National Stolen Property Act (18 U.S.C. § 2314).

126.    Defendant Weinstein was the mastermind of the schemes set forth above and effectuated their activities by conspiring with Defendants Shain, Gindi, and Hager to drain funds from Plaintiffs.  Weinstein structured transactions in which over $79 million dollars were taken from Plaintiffs and transferred into the entities which owned the Properties as well as other assets, entities owned and controlled by Defendants. Weinstein also directed the wrongful activities of the other Defendants.

30

127.   Defendants' various real estate investment companies comprise an enterprise under the federal RICO statutes.

128.   Thus, Defendants invested and used income and proceeds generated from a pattern of racketeering activity in the operation of an enterprise in violation of 18 U.S.C. §§ 1962(d).

129.   Defendants' enterprise involves the purchase of properties in at least six different states with funds and correspondence traveling interstate between and among Defendants and Plaintiffs such properties also are commercial properties which effect interstate commerce.  As a result, a nexus with interstate commerce is present.

130.   Plaintiffs were directly injured by Defendants' violations of the federal RICO statute and the predicate acts.  Specifically, Plaintiffs were injured directly by Defendants' fraudulent inducement to invest and loan moneys that were used to fund Defendants' real estate investment enterprise.

131.   As a result of those injuries, Plaintiffs have sustained damages.

**WHEREFORE**, Plaintiffs demand judgment as follows:

    i.     For compensatory damages in an amount to be determined at trial but in no event less than $100 million;

    ii.    For consequential and punitive damages;

    iii.   For treble damages;

    iv.   For attorneys' fees and costs in an amount to be determined at trial; and

    v.    For such other and further relief as this Court may deem equitable and just.

## SECOND COUNT
### (Conspiracy to Violate Civil RICO – 18 U.S.C. 1962 (d))

132.   Plaintiffs repeat and re-allege the foregoing allegations as if more fully set forth at length herein.

133.    In violation of 18 U.S.C. § 1962(d), the Defendants Weinstein, Shain, and Gindi, along with Hager, and each of them, knowingly, willfully, and unlawfully conspired to facilitate a scheme which included the operation or management of a RICO enterprise through a pattern of -racketeering activity as alleged above.

134.    The conspiracy commenced at least as early as 2005 and is ongoing.

135.    The conspiracy's purpose was to divert money from Plaintiffs to their own benefit by using mail and wire to solicit multiple "investments" in property that either was not lawfully owned by the Defendants or which was sold by the Defendants to multiple parties.

136.    Each Defendant committed at least one overt act in furtherance of such conspiracy. These acts in furtherance of the conspiracy included misleading Plaintiffs as to the value of the investment properties, the ability to flip them or obtain financing, and the terms and condition of purchase, all of which were reinforced and defended by Gindi and Shain in separate conversations with Mr. Wolinetz.  Hager prepared false legal documents, made many false statements regarding the value of the investment properties, and the terms and condition of purchase. Further, all Defendants knowingly executed false documents which they did not intend to abide by. All defendants received monies from the funds invested by Plaintiffs, all the while making it seem as though the funds were legitimately being used to finance the purchase and development of the Berkeley Township, Ocean County, Staten Island, Memphis and Florida properties.

137.    Even if some of the Defendants did not agree to harm Plaintiffs specifically, the purpose of the acts they engaged in was to advance the overall object of the conspiracy, and the harm to Plaintiffs was a reasonably foreseeable consequence of Defendants' actions.

138.    Plaintiff has been injured and continues to be injured in their business and property by Defendants' conspiracy in violation of 18 U.S.C. $ 1962(d). The unlawful actions of Defendants, and each of them, have directly, illegally, and proximately caused and continue to cause injuries to Plaintiffs in their business or property. Plaintiffs seek an award of damages in compensation for. among other things, the millions of dollars that Defendants stole from Plaintiffs. Plaintiffs further seeks an award of three times the damages they sustained, and the recovery of reasonable attorneys' fees and costs of investigation and litigation, as well as any other relief as authorized.

**WHEREFORE**, Plaintiffs demand judgment as follows:

   vi.    For compensatory damages in an amount to be determined at trial but in no event less than $100 million;

   vii.   For consequential and punitive damages;

   viii.  For treble damages;

   ix.    For attorneys' fees and costs in an amount to be determined at trial; and

   x.     For such other and further relief as this Court may deem equitable and just.

## <u>THIRD COUNT</u>
### <u>(Equitable Accounting)</u>

139.    Plaintiffs repeat and re-allege the foregoing allegations as if more fully set forth at length herein.

140.    The oral and written contracts between Plaintiffs and Defendants involve extensive and complicated accounts and transactions.

141.    Plaintiffs have made various requests for information regarding the Defendants' activities with regard to these transactions, all of which have been refused by Defendants.

142.    To date, Defendants have refused and been unable to account for any of Plaintiffs'

33

loans and/or investments and has refused to demonstrate how the money was used.

143.   There is no remedy at law that would resolve this issue as fully, adequately or expeditiously as an accounting.

**WHEREFORE,** Plaintiffs demand that the Court enter judgment directing Defendants to turn over all financial books and records for the period January 2005 -- to date to a forensic accountant for a full accounting, and otherwise provide an accounting as to all funds and properties described above or to any entity into which Plaintiffs' funds were transferred and, awarding Plaintiffs their costs and such other and further relief as this Court deems just and proper.

## FOURTH COUNT
### (Fraud—Weinstein, Gindi, Pine Projects, N-HK)

144.   Plaintiffs repeat and re-allege the foregoing allegations as if more fully set forth at length herein.

145.   As set forth in detail above, and incorporated into this Count by reference, Defendants Weinstein, Gindi, Pine Projects, New Cedar, and NH-K, through their agents Weinstein and Hager made fraudulent misrepresentations and/or omissions of material fact.

146.   Defendants knew or should have known that their statements were false when made.

147.   Defendants intended to deceive Plaintiffs with the misrepresentations and omissions and induce Plaintiffs to act to their detriment by continuing to invest substantial funds with Defendants and to loan money to Defendants and to forebear on their rights upon disclosure of the substantial fraud committed by Defendants.

148.   Plaintiffs had no knowledge of the falsity of the Defendants' representations and omissions and reasonably relied on the Defendants' misrepresentations to their detriment.

34

149.   As a result of Defendants' fraud and misrepresentation, Plaintiffs were damaged in an amount to be determined at trial but in no event less than $100 million.

**WHEREFORE**, Plaintiffs demand judgment as follows:

    i.     For compensatory damages in an amount to be determined at trial but in no event less than $100 million;

    ii.    For consequential and punitive damages;

    iii.   For attorneys' fees and costs in an amount to be determined at trial; and

    iv.    For such other and further relief as this Court may deem equitable and just.

## FIFTH COUNT
### (Breach of Fiduciary Duty Against Weinstein)

150.   Plaintiffs repeat and re-allege the foregoing allegations as if more fully set forth at length herein.

151.   During the course of their two-year business dealings, Mr. Wolinetz reposed confidence in Weinstein to guide and inform him with respect to real estate projects and Weinstein accepted his trust. Mr. Wolinetz's trust was also founded on the fact that the men come from the Orthodox Jewish community. Weinstein also owed a fiduciary duty to Mr. Wolinetz as a co-member in certain entities as described above.

152.   As a result, Defendant Weinstein and Plaintiff Mr. Wolinetz had an implied fiduciary relationship pursuant to which Weinstein owed Mr. Wolinetz a fiduciary duty.

153.   Pursuant to that fiduciary duty, Weinstein had a duty of loyalty, and was required to refrain from self-dealing and from taking unfair advantage. He was also required to disclose all material facts and act in Mr. Wolinetz's best interest.

154.   Instead, Weinstein exploited Mr. Wolinetz's trust by defrauding him and the other Plaintiffs. Specifically Weinstein made false representations about the terms and conditions of

1070284.1

repayment of Mr. Wolinetz's loans and about the value of the Properties, which he provided as collateral for those loans.

155.   In addition, Weinstein made omissions of material fact about the value and purchase price of certain properties and about the debt leveraged against the Properties or the ability to quickly resell those Properties, often causing Mr. Wolinetz to unknowingly accept a valueless security and/or ownership interest in such Properties in exchange for Plaintiffs' loans.

156.   Accordingly, Weinstein breached his fiduciary duty causing Mr. Wolinetz to suffer damages.

**WHEREFORE**, Plaintiffs demand judgment as follows:

    i.     For compensatory damages in an amount to be determined at trial but in no event less than $100 million.;

    ii.    For consequential and punitive damages;

    iii.   For attorneys' fees and costs in an amount to be determined at trial; and

    iv.    For such other and further relief as this Court may deem equitable and just.

**SIXTH COUNT**
**(Conversion)**

157.   Plaintiffs repeat and re-allege the foregoing allegations as if more fully set forth at length herein.

158.   Defendants received Plaintiffs' funds based on false statements.

159.   The funds were earmarked to fund the purchase of specific properties and were intended as loans secured by mortgages on specific properties. In addition, as an incentive to lend funds, Plaintiffs were often falsely promised an equity interest in the entity owning such Properties.

160.   Defendants wrongfully exercised dominion and control over the funds.

36

161.    Despite repeated requests, Defendants have refused to return the funds and have improperly converted them for their own use causing damage to Plaintiffs.

162.    **WHEREFORE**, Plaintiffs demand judgment as follows:

    i.    For compensatory damages in an amount to be determined at trial but in no event less than $100 million.;

    ii.    For consequential and punitive damages;

    iii.    For attorneys' fees and costs in an amount to be determined at trial; and

    iv.    For such other and further relief as this Court may deem equitable and just.

## SEVENTH COUNT
### (Constructive Trust)

163.    Plaintiffs repeat and re-allege the foregoing allegations as if more fully set forth at length herein.

164.    Certain Defendants owed a fiduciary duty to Plaintiffs as described above.

165.    Defendants obtained at least $79 million from Plaintiffs by fraudulent means.

166.    As a result of the fraud, a constructive trust should be imposed over the monies provided by Plaintiffs.

167.    Defendants would be inequitably enriched if they were allowed to keep Plaintiffs' funds and assets derived therefrom.

**WHEREFORE**, Plaintiffs request that the Court impose a constructive trust over the all of the Properties, accounts, assets and real property of Defendants and order such other and further relief as this Court deems just and proper.

1070284.1

## EIGHTH COUNT
### (Unjust Enrichment)

168.    Plaintiffs repeat and re-allege the foregoing allegations as if more fully set forth at length herein.

169.    Mr. Wolinetz directly or through the other Plaintiffs transferred at least $79 million to Defendants and thus conferred a benefit upon them.

170.    Weinstein or his companies voluntarily requested and received all such funds under false pretenses and improperly exercised dominion and control over those funds.

171.    Under the circumstances, it would be inequitable for Defendants to continue to retain Plaintiffs' funds and the properties or assets acquired therewith.

**WHEREFORE**, Plaintiffs demand judgment as follows:

i.      For compensatory damages in an amount to be determined at trial but in no event less than $100 million.;

ii.     For consequential and punitive damages;

iii.    For attorneys' fees and costs in an amount to be determined at trial; and

iv.     For such other and further relief as this Court may deem equitable and just.

## NINTH COUNT
### (Breach of Contract)

172.    Plaintiffs repeat and re-allege the foregoing allegations as if more fully set forth at length herein.

173.    Plaintiffs and Defendants entered into various oral and written contracts as described above.

174.    Those contracts are in the form of mortgage notes, promissory notes, pledge agreements, settlement agreements, and signed letters acknowledging the terms and conditions of

38

various transactions, including interest rates, ownership structure, and percentages of liability.

175.    Defendants breached the agreements by failing to repay the funds loaned and by failing to transfer various interests as described above.

176.    As a result, Plaintiffs have been damaged.

**WHEREFORE**, Plaintiffs demand judgment as follows:

i.      For compensatory damages in an amount to be determined at trial but in no event less than $100 million;

ii.     For consequential and punitive damages;

iii.    For pre-judgment interest;

iv.     For attorneys' fees and costs in an amount to be determined at trial; and

v.      For such other and further relief as this Court may deem equitable and just.

## TENTH COUNT
### (Promissory Estoppel)

177.    Plaintiffs repeat and re-allege the foregoing allegations as if more fully set forth at length herein.

178.    Defendants made promises to Plaintiffs, as set forth above, to induce them to invest in the Properties.

179.    Defendants should reasonably have expected that their promises would induce action by Plaintiffs.

180.    In fact, Plaintiffs reasonably relied the foregoing.

181.    Injustice can be avoided only by enforcement of Defendants' promises.

182.    Plaintiffs have sustained damages as a result of their reasonable reliance on Defendants' promises.

**WHEREFORE**, Plaintiffs demand judgment as follows:

1070284.1

i.      For compensatory damages in an amount to be determined at trial but in no event less than $100 million;

ii.     For consequential and punitive damages;

iii.    For pre-judgment interest;

iv.     For attorneys' fees and costs in an amount to be determined at trial; and

v.      For such other and further relief as this Court may deem equitable and just.

## ELEVENTH COUNT
### (Civil Conspiracy)

183.   Plaintiffs repeat and re-allege the foregoing allegations as if more fully set forth at length herein.

184.   Defendants Gindi, Weinstein, and Shain, conspired with the common purpose of defrauding Mr. Wolinetz out funds which were intended to be invested in Berkeley Terrace, Forest Ave (in Staten Island, New York), the Memphis properties, and the Florida properties.

185.   Defendant Gindi participated with Weinstein in making the false statements set forth above and otherwise withholding material information and acting in furtherance of the scheme to defraud Plaintiffs.

186.   Defendants Shain and Weinstein conspired with Hager for the common purpose of defrauding Mr. Wolinetz out of funds which were to be invested in Ellis Ave, New Cedar Plaza, Parker Road, the Memphis properties, and the Florida properties.

187.   Weinstein, Gindi, Shain, and Hager each committed overt acts in furtherance of their common purpose. Weinstein made many false statements regarding the value of the investment properties, the ability to flip them or obtain financing, and the terms and condition of purchase, all of which were reinforced and defended by Gindi and Shain in separate conversations with Mr. Wolinetz. Hager prepared false legal documents, made many false

statements regarding the value of the investment properties, and the terms and condition of purchase. Further, all Defendants knowingly executed false documents which they did not intend to abide by. All defendants received monies from the funds invested by Plaintiffs, all the while making it seem as though the funds were legitimately being used to finance the purchase and development of the Berkeley Township, Ocean County, Staten Island, Memphis and Florida properties.

188.   As a result, Plaintiffs have been damaged.

**WHEREFORE**, Plaintiffs demand judgment as follows:

i.      For compensatory damages in an amount to be determined at trial;

ii.     For consequential and punitive damages;

iii.    For attorneys' fees and costs in an amount to be determined at trial; and

iv.     For such other and further relief as this Court may deem equitable and just.

## TWELFTH COUNT
### (Injunctive Relief)

189.   Plaintiffs repeat and re-allege the foregoing allegations as if more fully set forth at length herein.

190.   As a result of the fraud, conversion, and breaches of fiduciary duties by Defendants, Plaintiffs request, on an emergency basis, that this Court enter a temporary restraining order against Defendants enjoining them from further encumbering, in any way, or transferring, selling or foreclosing on any of the Properties and/or all of Defendants' properties, assets and accounts held individually or jointly until a final determination with respect to Plaintiffs' interests in such property is made. Plaintiffs further request that the Court enjoin all third parties from exercising any dominion or control, transferring, encumbering, or foreclosing on any of the Properties and/or all of Defendants' properties, assets, and accounts held

41

individually or jointly.

191.   Failure to grant a temporary restraining order while the Court adjudicates the many claims alleged herein will result in irreparable harm to Plaintiffs because Defendants will continue to transfer and encumber the Properties and their other assets, which were likely purchased with Plaintiffs' funds, leaving such Properties and assets over-leveraged or sold to third parties.

192.   Further, there is no adequate remedy at law available to Plaintiffs to stop Defendants continuing wrongs.

193.   Finally, a temporary restraining order will not negatively affect the public or any innocent third parties.

**WHEREFORE**, Plaintiffs request that the Court enter a temporary restraining order enjoining Defendants from taking any action to transfer, encumber or foreclose upon any of the Properties and/or all other properties, accounts and assets, wheresoever located, held by the Defendants individually or jointly.

### DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable as a matter of right.

**PHILLIPS NIZER LLP**
Attorneys for Plaintiffs

By: /s/ N. Ari Weisbrot

Dated: May 20, 2009

1070284.1